```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
JAMIE E. YOUNG,

                    Plaintiff,                      ORDER
                                                    18-CV-4216 (JS)(JMW)
        -against-

MARK LUGO, et al.

                    Defendants.
-------------------------------------------------X
```

APPEARANCES

For Plaintiff     Frederick K. Brewington, Esq.
Jamie Young:     Albert Darnell Manuel, III, Esq.
              Cobia Malik Powell, Esq.
              Law Offices of Frederick K. Brewington
              556 Peninsula Boulevard
              Hempstead, New York 11550


For Defendant
Dr. Carl Goodman:  Greg M. Mondelli, Esq.
              Amy E. Bedell, Esq.
              Carl A. Formicola, Esq.
              Jessica D. Klotz, Esq.
              Lewis Johs Avallone Aviles, LLP
              1377 Motor Parkway, Suite 400
              Islandia, New York 11749


SEYBERT, District Judge:

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, Defendant Dr. Carl Goodman ("Dr. Goodman") objects to several portions of the February 6, 2026 Report and Recommendation issued by Magistrate Judge James M. Wicks. ("R&R", ECF No. 243.) Specifically, Dr. Goodman objects to the R&R's recommendation that

1

this Court deny his Motion for Summary Judgment ("Motion", ECF No. 220) on claims "for Fourth Amendment violations, assault and battery, medical malpractice, and false imprisonment" made by Plaintiff Jamie Young ("Plaintiff") related to a sedation and rectal examination of Plaintiff while in law enforcement custody on December 14, 2017. (See Obj., ECF No. 247; Supp. Obj., ECF No. 250; Reply, ECF No. 252.) Judge Wicks reached this conclusion by finding Dr. Goodman conducted the examination under color of state law and is not entitled to qualified immunity. Although this Court agrees with Judge Wicks's state-action analysis and conclusion, it finds Dr. Goodman is entitled to qualified immunity. (See generally R&R.) Dr. Goodman's objections are thus SUSTAINED in part and OVERRULED in part, such that Dr. Goodman's Motion is GRANTED, as provided for below.

BACKGROUND

I.   Undisputed Facts

The Court draws all undisputed facts from the Rule 56.1 materials submitted by Plaintiff and Dr. Goodman (collectively, the "Parties"). (See Pl.'s 56.1 Response, ECF No. 221-16, attached to Opp'n; Defs.' 56.1 Response, ECF No. 222-1, attached to Reply.) On December 14, 2017, Parole Officer and Defendant Mark Lugo ("Lugo") arrested Plaintiff pursuant to a warrant for allegedly violating his parole by fraternizing with Shati Roy ("Roy"), a

2

known parolee.  (Pl.'s 56.1 Response ¶¶ 1-2.) Plaintiff was serving parole for several convictions from 1996, including for multiple drug-related crimes.  (Pl.'s 56.1 Response ¶ 6; Certificate of Incarceration, ECF No. 220-44, <u>attached to</u> Motion.) Plaintiff has a history of cocaine abuse and has spent time in drug rehabilitation, which is reflected in his medical records.  (Pl.'s 56.1 Response ¶¶ 8, 52; Brookhaven Hospital Medical Records, ECF No. 220-36, <u>attached to</u> Motion.) Lugo testified that, at the scene of the arrest, Roy was searched and found to be in possession of crack cocaine in his body.  (<u>Id.</u> ¶¶ 13-14.)

After he was arrested and taken into custody, Lugo and Parole Officer and Defendant Orrison McLean drove Plaintiff to the Suffolk County Police Department's Fifth Precinct.  (<u>Id.</u> ¶ 5.) During this car ride, Plaintiff became "fidgety in the back seat" and allegedly "continued to move around."[1]  (<u>Id.</u> ¶¶ 9, 11 (reciting Lugo's testimony).) After arriving at the Fifth Precinct, Lugo and Parole Officer and Defendant Alberto Acevedo ("Acevedo") asked Plaintiff to bend down and squat after he had already removed his clothes.  (<u>Id.</u> ¶ 18.) During the search, Lugo observed something in Plaintiff's rectum resembling a "bubble."  (<u>Id.</u> ¶¶ 20-22.)

---

[1] Plaintiff disputes that he put his hands in his pants during the car ride, but does not dispute that he became "fidgety" or made certain "movements" while in the car.  (<u>Id.</u> ¶¶ 9, 11.)

3

Although Plaintiff maintained the "bubble" was a hemorrhoid, Lugo believed it may have been a bag of drugs.  (Id. ¶¶ 22, 26.)

After the search and at the direction of his supervisor, Lugo transported Plaintiff to Brookhaven Memorial Hospital Medical Center ("Brookhaven Hospital" or the "Hospital"), accompanied by Parole Officer and Defendant Alonzo Payton ("Payton"). (Id. ¶¶ 28, 32.) Upon arriving in front of Brookhaven Hospital, Plaintiff exhibited several instances of erratic and non-compliant behavior, including: refusing requests from Lugo and Payton to exit the vehicle (Id. ¶ 37); physically resisting attempts from Lugo and Payton to pull him from the vehicle, including by kicking Lugo (Id. ¶¶ 38-41); and screaming that he did not want to be there (Id. ¶ 47).  Plaintiff remained in law enforcement custody throughout his time at Brookhaven Hospital.  (Id. ¶ 43.) Once Plaintiff entered the building, he continued yelling that he did not want to be there and refused to check in during the intake process.  (Id. ¶ 47; Defs.' 56.1 Response ¶ 4.)

As part of the intake process, Nurse Henry Hernandez ("Hernandez") created a triage note (the "Triage Note") explaining Plaintiff's medical history, which included "hypertension, back pain, Cocaine/dope abuse, and that he had undergone back surgery with screws and plates, facial reconstruction, and left leg

surgery."[2]  (Pl.'s 56.1 Response ¶ 52; see also Defs.' 56.1 Response ¶ 13.)  The Triage Note's information on past cocaine abuse was ultimately included in Dr. Goodman's medical record.  (Pl.'s 56.1 Response ¶ 88.)  Following the intake, Plaintiff was taken into a room in "Trauma 1" via a wheelchair, where he remained agitated and refused treatment "at the top of his lungs."  (Id. ¶¶ 62-63 (citing Pl.'s Dep. Tr., ECF No. 220-11, attached to Motion).)

Dr. Goodman, an attending emergency physician at Brookhaven Hospital, first observed Plaintiff being brought into Trauma 1 accompanied by several uniformed and plain-clothes officers with "a fair amount of commotion."  (Id. ¶¶ 58, 73 (citing Goodman Dep. Tr., ECF No. 220-23, attached to Motion).)  Later that night, Plaintiff told Dr. Goodman he denied swallowing drugs or putting anything in his rectum.  (Id. ¶ 95.)  On the other hand, the officers told Dr. Goodman they believed Plaintiff had "a rectal foreign body, possibly contraband."  (Id. ¶¶ 84-85.)  It is undisputed law enforcement provided the basis for Dr. Goodman's belief that Plaintiff may have had contraband in his rectum.[3]  (Id. ¶ 108.)  Dr. Goodman testified, and Plaintiff also emphasizes in his 56.1 materials, that he was calm at times while his agitation

---

[2] The Parties dispute whether the information on "cocaine/dope abuse" came from law enforcement or auto-populated from a previous Hospital visit.  (Id. ¶ 90.)

[3] All of Dr. Goodman's interactions with Plaintiff were conducted with law enforcement present.  (Id. ¶ 82.)

was "waxing and waning" throughout the night.  (Id. ¶ 80; Defs.' 56.1 Response ¶ 12.)

Before conducting an examination, Dr. Goodman consulted via telephone with the Hospital's legal counsel, Jessica Terranova ("Terranova").  (Pl.'s 56.1 Response ¶ 115.) Dr. Goodman told Terranova he did not know how to proceed because he had a patient in law enforcement custody, refusing treatment, and acting agitated.  (Id. ¶¶ 119-20.) Terranova asked Dr. Goodman whether Plaintiff had capacity or was consenting; Dr. Goodman told her Plaintiff did not consent.  (Id. ¶ 124.) She then instructed Dr. Goodman to have an informed consent discussion with Plaintiff and to document the discussion in the chart.  (Id. ¶ 125.) Terranova further told Dr. Goodman "not to do the search of the patient at the request of law enforcement, but to do whatever Dr. Goodman felt within his professional medical judgment was necessary for the care and treatment of the patient."  (Id. ¶¶ 126-27.) Dr. Goodman never discussed any of his treatment plans with Terranova, including sedation methods.  (Id. ¶¶ 124-27.)

After the call with Terranova, Plaintiff was subsequently transferred from a wheelchair to a gurney and connected to a monitor and blood pressure cuff.  (Id. ¶¶ 134, 140.) Dr. Goodman then injected Plaintiff with ketamine to sedate him while Lugo and Payton restrained Plaintiff.  (Id. ¶¶ 150, 155.)

Just prior to the injection, Plaintiff was still agitated. (Id. ¶ 150.) During the sedation, Plaintiff's abdomen and pelvis were x-rayed, and the results of the x-ray appeared to show no foreign body. (Id. ¶ 166.) Despite knowing the x-ray appeared negative, Dr. Goodman then externally examined Plaintiff's rectum. (Id. ¶ 168.) After this, he performed a manual rectal examination with a lubricated and gloved index finger (the "Examination"). (Id. ¶¶ 170-71.) The Examination revealed only hemorrhoids. (Id. ¶¶ 175-76.) Plaintiff was discharged back into law enforcement custody. (Id. ¶ 184.) There is no evidence Dr. Goodman performed a psychological evaluation, or other diagnostic tests, before conducting the sedation and Examination. (Defs.' 56.1 Response ¶¶ 10, 14.)

## II.   Disputed Facts

The Parties dispute whether Dr. Goodman's actions reflected his own medical judgment or were undertaken merely at the behest of law enforcement. (Pl.'s 56.1 Response ¶ 129.) Other purported interactions bearing on this point are also disputed. For example, Plaintiff testified Dr. Goodman, Lugo, and Acevedo had a pre-sedation "sidebar" conversation about 20-to-30 feet away from him in the Hospital, which he could not hear; however, Dr. Goodman testified he does not recall such a conversation. (Id. ¶¶ 96-102.) Plaintiff states that, after the "sidebar," Dr. Goodman

7

told him he would be "put to sleep," to which Plaintiff responded, "[d]on't f***king touch me [ . . . ] I don't want to be here," and continued to refuse examination. (Id. ¶¶ 105-06.) The Parties also dispute the extent to which less invasive examination options, short of ketamine administration and a rectal examination, were available. (Id. ¶¶ 44, 94; Defs.' 56.1 Response ¶ 22.)

Several other facts remain in dispute. For example, during the car ride to the Fifth Precinct, the Parties disagree about whether Lugo observed Plaintiff put his hands down the back of his pants (Id. ¶ 10) or repeatedly bang his head against the car window (Id. ¶ 36). Further, the Parties dispute whether the information regarding Plaintiff's alleged head-banging played a role in Dr. Goodman's subsequent decisions. (Id. ¶¶ 78, 83, 86.) Although the Parties generally agree Plaintiff screamed throughout his time at the Hospital with intermittent calm periods, they disagree on some specifics: Dr. Goodman said Plaintiff's agitation made it difficult to communicate with him, while Plaintiff asserts Dr. Goodman never attempted to interview him. (Id. ¶ 79.) Although Dr. Goodman testified he attempted to validate information "to the extent possible," Plaintiff faults the Doctor for failing to order either a psychological evaluation or toxicology screening, and for not informing Terranova that he planned to use ketamine. (Pl.'s 56.1 Response ¶¶ 92, 110.)

III. Relevant Procedural Background

A.   Commencement of Action and Substantive Claims Against Dr. Goodman

On January 25, 2018, Plaintiff commenced this action against several Defendants, including Dr. Goodman. (See Compl., ECF No. 1.) On December 27, 2021, Plaintiff filed the operative Second Amended Complaint.  ("SAC," ECF No. 151.) The SAC generally alleges Dr. Goodman acted jointly with law enforcement to violate Plaintiff's Constitutional rights and commit several state-level torts.  (See generally SAC.) Specifically, the SAC alleges Dr. Goodman violated Plaintiff's Fourth Amendment rights by conducting an unreasonable, warrantless, nonconsensual body cavity search and using excessive force by sedating and restraining Plaintiff, and further violated Plaintiff's Eighth Amendment rights by subjecting him to cruel and unusual punishment.  (Id. ¶¶ 39-59; 78-84.) Plaintiff also asserts state-law claims for assault, battery, intentional and negligent infliction of emotional distress, negligence, medical malpractice, and false imprisonment.[4]  (Id. ¶¶ 92-126.)

---

[4] The Constitutional claims are made under 42 U.S.C. § 1983. Plaintiff also asserted claims for malicious prosecution, abuse of process, fabrication of evidence, and violation of substantive due process rights, which have been voluntarily withdrawn against Dr. Goodman.  (R&R at 21-23, 25.)

B.   Dr. Goodman's Motion & Plaintiff's Opposition

On February 29, 2024, Dr. Goodman served his motion for summary judgment, advancing two principal arguments against the constitutional claims in his Support Memo.  (See generally Support Memo, ECF No. 220-48, attached to Motion.) First, Dr. Goodman contends that, as a private physician employed by a private hospital, his actions are not attributable to the State and reflect only his own medical judgment.  (Support Memo at 4-10.) Second, even assuming state action, Dr. Goodman argues he is entitled to qualified immunity because: (1) his conduct was reasonable under the circumstances; and (2) no clearly established authority would place a reasonable physician on notice that his conduct was unconstitutional. (Id. at 14-23.) Should the Court dismiss the federal claims, Dr. Goodman contends it should also decline supplemental jurisdiction over the state-law claims.  (Id. at 33.)

On March 29, 2024, Plaintiff served his Opposition, arguing several factual disputes render summary judgment inappropriate.   (See generally Opp'n.) Plaintiff contends Dr. Goodman's conduct is fairly attributable to the State because it was undertaken at the behest of, and in coordination with, law enforcement to further law enforcement objectives. (Opp'n at 7-12.)  Moreover, Plaintiff contends qualified immunity is inapplicable because clearly-established precedent bars invasive

10

body cavity searches conducted without consent, a warrant, or adequate justification, and because Dr. Goodman's conduct was not reasonable. (Id. at 14-17.) Plaintiff also maintains the state-law claims should independently survive summary judgment. (See Id. at 22.)

C.   Judge Wicks's R&R

On April 4, 2025, this Court referred the Motion to Judge Wicks for a Report and Recommendation, which was returned on February 7, 2026.  (See generally R&R.) The R&R recommends granting summary judgment on Plaintiff's claims for malicious prosecution, abuse of process, fabrication of evidence, cruel and unusual punishment, substantive due process, intentional and negligent infliction of emotional distress, and negligence, while denying summary judgment on the Fourth Amendment claims and state-law claims for assault and battery, medical malpractice, and false imprisonment.  (Id. at 44-45.) With respect to state action, Judge Wicks recommends the Court find Dr. Goodman acted under color of state law, as law enforcement officers initiated the investigation into Plaintiff, supplied the information underlying the Examination, and performed investigative activities typically attributable to police at law enforcement's request. (R&R at 14-15.)

11

Judge Wicks further recommends against granting summary judgment on qualified immunity, contending factual disputes exist as to the necessity, purpose, and manner of the Examination, including: whether Dr. Goodman possessed reasonable suspicion to conduct the Examination; why the Examination proceeded despite the negative x-ray; whether less invasive methods existed; why Dr. Goodman did not inform Terranova of his intent to administer ketamine before the Examination; and the extent to which the Examination reflected Dr. Goodman's medical judgment.  (Id. at 16-21.) As to probable cause, the R&R noted some of the information law enforcement relayed to Dr. Goodman was disputed, including whether Plaintiff banged his head on the car window and whether officers observed Plaintiff reach into his pants in the police vehicle. (Id. at 17-18.)

The R&R's discussion regarding whether any precedent clearly established Dr. Goodman's conduct as illegal is much briefer.  Relying on Sloley v. VanBramer, 945 F.3d 30, 38 (2d Cir. 2019) and Sanchez v. Bonacchi, 799 F. App'x 60, 62 (2d Cir. 2020), in a single sentence, the R&R explains that "the right to be free from unreasonable body cavity searches without reasonable suspicion has been clearly established under recent precedent from this Circuit."  (Id. at 18.) However, shortly after the R&R issued, the Supreme Court issued its decision in Zorn v. Linton, which

12

bears on the "clearly established" analysis and is addressed below. 146 S. Ct. 926 (2026).

D.    Dr. Goodman's Objections & Plaintiff's Response

On March 20, 2026, Dr. Goodman filed his Objections to the R&R, primarily objecting to Judge Wicks's rulings on state action and qualified immunity.  (See generally Obj.) On April 7, 2026, at this Court's directive, Dr. Goodman submitted a Supplemental Objection addressing the applicability of the Supreme Court's decision in Zorn.   (See generally Supp. Obj.)  The Supplemental Objection contends that, under Zorn, Dr. Goodman did not violate clearly established law, as no relevant precedent had the requisite "high degree of specificity" needed to clearly proscribe Dr. Goodman's conduct.  (Supp. Obj. at 3-4 (citing Zorn, 146 S. Ct. at 931).)

On May 1, 2026, Plaintiff filed his Reply, asserting Judge Wicks was correct on state action and qualified immunity. (See generally Reply.) He further maintains Zorn does not alter this conclusion, because existing precedent suffices to clearly establish Dr. Goodman's conduct as illegal, and because Zorn does not require a case "directly on point." (Id. at 10 (citing Zorn, 146 S. Ct. at 935 (Sotomayor, J. dissenting)).) Plaintiff also argues remaining state-law claims and punitive damages issues are properly reserved for trial.  (Reply at 17-21.)

13

Discussion

I.  Applicable Law, Generally

A.  Reports and Recommendations

A district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1)(C); see also FED. R. CIV. P. 72(b)(3). A party objecting to an R&R "must lodge a specific objection to some specific aspect of the R&R," and "[w]hen a timely filed objection raises and properly briefs arguments previously rejected by the magistrate judge, the district judge must review those arguments de novo."  Nambiar v. Cent. Orthopedic Grp., LLP, 158 F.4th 349, 361 (2d Cir. 2025).  The Court need not review the findings and conclusions to which no proper objection has been made, and an objection "may not simply rest on the briefs considered by the magistrate judge."  Id.; see also Thomas v. Arn, 474 U.S. 140, 150 (1985).

B.  Summary Judgment

The Court shall grant summary judgment under Rule 56(a) when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A fact is material for the purposes of resolving a summary judgment motion "when it might affect the outcome of the suit under the governing law."  Adamson v. Miller,

14

808 F. App'x 14, 16 (2d Cir. 2020). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. (quoting Jeffreys v. City of N.Y., 426 F.3d. 549, 553 (2d Cir. 2005)).

"The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The burden of persuasion may be satisfied by either: "(1) [ ] submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." Id. (further citation omitted). Once the moving party has met its burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts" and instead must offer "some hard evidence showing that its version of the events is not wholly fanciful." Stein v. County of Nassau, 417 F. Supp. 3d 191, 197 (E.D.N.Y. 2019) (citations omitted).

"Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010) (citations and quotation marks omitted). In reviewing the record,

15

the Court "may not make credibility determinations or weigh the evidence" as such determinations are to be made by the jury, not the judge.  Id. (citing Reeves v. Sanderson Plumbing Prods. Inc., 530 U.S. 133, 150 (2000)).  Accordingly, where an issue as to a material fact cannot be resolved without weighing the credibility of a witness, summary judgment is improper.  Id. at 545-46.

## II.  Defendant Was a State Actor

### A.    Applicable Law

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  Feingold v. N.Y., 366 F.3d 138, 159 (2d Cir. 2004) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).  Courts generally apply three tests to determine whether a private party may be treated as a state actor: (1) the "compulsion" test, which asks whether the private party acted pursuant to the State's coercive power or control; (2) the "joint action" or "close nexus" test, satisfied where the State provides significant encouragement, the private party is a willful participant in joint activity with the State, or the private party's functions are "entwined" with state policies; and (3) the "public function" test, which considers whether the private entity "has been delegated a public function by the State."  Rene v.

16

Mustafa, No. 16-CV-4072, 2024 WL 1332556, at *21 (E.D.N.Y. Mar. 28, 2024) (quoting Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008)).

State-action disputes often arise where public law enforcement officers and private medical personnel interact. For example, in Falls v. Pitt, a Southern District court determined a private nurse acted under color of state law when she performed an anal cavity search and x-ray at the direction of police officers, who were searching for narcotics pursuant to a warrant. No. 16-CV-8863, 2021 WL 1164185, at *50-51 (S.D.N.Y. Mar. 26, 2021). The Court concluded that, although the nurse may have had a competing medical interest in identifying contraband, she was primarily performing a law-enforcement function. Id. at *50. By contrast, in Williams v. City of N.Y., private hospital employees were not deemed state actors where NYPD officers transported the plaintiff to the hospital and relayed information to staff, who then exercised independent medical judgment in determining treatment. 2017 WL 4158903, at *3-4 (S.D.N.Y. Sept. 14, 2017); see also Fisk v. Letterman, 401 F. Supp. 2d 362, 376 (S.D.N.Y. 2005) ("[c]ommunications between a private and a state actor, without facts supporting a concerted effort or plan between the parties, are insufficient to make the private party a state actor").

17

B.    Application

This Court agrees with Judge Wicks's state action analysis and finds sound his application of Falls. (R&R at 13–14.) As Judge Wicks explained:

> So too here, based on the record before the Court, Goodman would not have performed his cavity search on Plaintiff had he not discussed Plaintiff's circumstances with law enforcement prior. (See ECF No. 221-6, Goodman Dep. Tr. at 149:22-25, 150:2-6 (Goodman answering "yes" when asked if law enforcement requested an examination for a foreign body); 68:7-19 (Goodman testifying that he obtained Plaintiff's medical history from law enforcement before conducting the search)). Notably, "[t]he police provided the basis for Dr. Godman to think the Plaintiff had a foreign body in his rectum." (ECF No. 221-16 at ¶ 108; see also ECF No. 220-23, Goodman Dep. Tr. at 85:8-12 (establishing the "only basis" of Goodman thinking Plaintiff had a foreign body in his rectum was what the police told him)). Further, in order for Plaintiff to be "cleared for confinement," law enforcement needed to have the Hospital staff "check out" the potential secretion inside of Plaintiff. (See ECF No. 221-7, Lugo Dep. Tr. at 193:21-25, 194:2-18 (Parole Officer Lugo testifying that he "asked the doctor" to check out the concerns they had about the potential for drugs inside Plaintiff, and "then the doctor did the job they had do to"). Similarly, to ensure Plaintiff's "benefit and safety," Goodman needed to "validate the information" presented by law enforcement by performing the search he did. (See ECF No. 221-16 at ¶¶ 110, 111.)

(R&R at 13-14.)

18

Dr. Goodman argues Falls is distinguishable because, there, the nurse acted pursuant to a warrant, documented law enforcement's directive in her notes, and told the plaintiff she was authorized to search, while, here, Dr. Goodman purportedly relied on independent medical judgment. (Obj. at 2-3 (citing Falls, 2021 WL 1164185, at *50).) But viewing the Examination-related facts in a manner most favorable to Plaintiff —as we must have done at this stage—it is difficult to imagine the Examination taking place without any input from law enforcement. In addition to the dispute over whether Dr. Goodman used his own judgment in ordering the Examination, there is no dispute that (1) law enforcement supplied the information forming the basis for Dr. Goodman's suspicion of contraband, and (2) Dr. Goodman never interacted with Plaintiff without law enforcement present. (See Infra p. 5.) These undisputed facts establish the Doctor was a willful participant in a joint activity with the officers, who are state actors. This is sufficient to establish Dr. Goodman was acting under color of State law. See Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002). Accordingly, the Court OVERRULES Dr. Goodman's objection on state action and ADOPTS Judge Wicks's recommendation on the same.

19

III. Defendant is Entitled to Qualified Immunity

   A.   Applicable Law

        Qualified immunity shields state actors "performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Where applicable, qualified immunity offers "ample protection to all but the plainly incompetent or those who knowingly violate the law." Sacaza v. City of N.Y., 169 F.4th 363, 369 (2d Cir. 2026) (quoting Dufort v. City of N.Y., 874 F.3d 338, 354 (2d Cir. 2017)); see also Torres v. Vill. of Sleepy Hollow, 379 F. Supp. 2d 478, 482 (S.D.N.Y. 2005)) (qualified immunity available to private individuals acting under color of state law). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established', whether it was 'objectively reasonable'" for the State actor to believe "the conduct at issue was lawful." Monroe v. Gould, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (quoting Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013)). "Courts may use their discretion in deciding the order in which to approach a qualified immunity analysis." Sacaza, 169 F.4th at 370 (citing Coollick v. Hughes, 699 F.3d 211, 219-20

20

(2d Cir. 2012)).  "To be entitled to qualified immunity at the summary judgment stage of a case, a defendant must show that, even viewing the evidence in the light most favorable to the plaintiff, the defendant's actions did not violate clearly established law." Falls, 2021 WL 1164185, at *28 (citation omitted).

A right is clearly established only when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Rivas-Villegas v. Cortesluna, 595 U.S. 1, 5 (2021) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).  To find a right is clearly established, courts ordinarily "need to identify a case where an officer acting under similar circumstances was held to have violated" the Constitution.  Escondido v. Emmons, 586 U.S. 38, 43 (2019) (further citation omitted); see also Zorn, 146 S. Ct. at 930 (citing Rivas-Villegas, 595 U.S. at 5) ("[a] right is not clearly established if existing precedent does not place the constitutional question 'beyond debate'").  "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" Zorn, 146 S. Ct. at 930 (citing District of Columbia v. Wesby, 583 U.S. 48, 63 (2018)).  "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice."  Id. (citing Kisela v. Hughes, 584 U.S. 100, 105 (2021)).

21

Those acting under color of state law will receive qualified immunity "unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." Id. (citing City and County of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015)).

B.    Application

In recommending denial of summary judgment, Judge Wicks concluded "the right to be free from unreasonable body cavity searches without reasonable suspicion has been clearly established under recent precedent from this Circuit," citing to Sloley and Sanchez.    (R&R at 18.)  Neither decision, however, clearly proscribes Dr. Goodman's specific conduct or defines any purported right against the Examination "beyond debate".

In Sloley, two state troopers conducted a strip and visual body cavity search of a plaintiff following his misdemeanor arrest, which was prompted when a drug-sniffing dog showed interest in his vehicle.  945 F.3d at 36.  The Second Circuit denied summary judgment because clearly established law required "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity," and factual disputes existed as to whether such suspicion was present. Id. at 40 (citing People v. Hall, 10 N.Y.3d 303, 311 (2008)).  The Circuit emphasized that no undisputed facts suggested the

22

plaintiff was secreting drugs in his rectum, and no evidence indicated he engaged in suspicious movements, fidgeting, or had a history of rectally concealing drugs.  Id. at 46.

In Sanchez, a post-trial ruling, the Second Circuit applied Sloley and concluded a manual body cavity search undertaken incident to arrest and without reasonable suspicion violated clearly established law.  799 F. App'x. at 62.  The Second Circuit's decision offered little factual discussion, but the district court's Sanchez opinion indicated the jury determined an officer conducted a manual body cavity search while executing a search warrant.  See Sanchez v. Bonacchi, No. 5:14-CV-0452, 2018 WL 4275986, at *2 (N.D.N.Y. Sept. 7, 2018), rev'd and remanded, 791 F. App'x 218 (2d Cir. 2019), opinion vacated and superseded, 799 F. App'x 60, and aff'd, 799 F. App'x 60 (2d Cir. 2020).[5]  The Second Circuit determined this search was conducted without reasonable suspicion.  Sanchez, 799 F. App'x at 62.

The undisputed facts show Dr. Goodman faced circumstances far different from those in Sloley and Sanchez.  Even viewing the facts in a light most favorable to Plaintiff, none of the following high-level facts are disputed: Plaintiff arrived at the Hospital behaving erratically, including by screaming "at the top of his lungs"; medical records reflected a history of

---

[5] The R&R did not cite to the district court's Sanchez opinion.

23

Plaintiff's "cocaine/dope abuse"; law enforcement officers reported to Dr. Goodman their belief Plaintiff was rectally concealing narcotics; and Plaintiff denied the assertions. (See infra pp. 4-5.) This undisputed level of chaos, and allegations pointing directly to Plaintiff's rectum, are far different from Sloley, where no facts pointed to the body cavity, and Sanchez, which addressed a lack of reasonable basis to believe the detainee was rectally concealing drugs. Sloley, 945 F.3d at 36; Sanchez, 799 F. App'x 60.

Moreover, neither Sloley nor Sanchez addressed a scenario involving potential exigent medical circumstances in addition to the law-enforcement interests. Even assuming the Examination was conducted primarily for law-enforcement reasons, the presence of supplemental medical considerations distinguishes this case from precedent involving purely investigative searches: here, there was the potential risk of a bag of drugs exploding, which could have been fatal. Further creating distance from Sloley and Sanchez is Dr. Goodman's consultation with counsel before beginning the Examination, which bolsters the reasonableness of his conduct and demonstrates it was not clear to him, a reasonable actor, that performing the Examination would violate Plaintiff's rights.

Nor does the previously-discussed Falls case clearly establish Dr. Goodman's conduct as illegal. Although Falls concluded the defendant nurse was entitled to qualified immunity, it declined to grant summary judgment due to a "he-said, she said" factual dispute about whether the nurse used lubricant in the search, and collected cases suggesting lubricant may be necessary for a reasonable search. Falls, 2021 WL 1164185, at *53. No such dispute exists here, as neither party disputes Dr. Goodman used lubrication in his Examination. (Pl.'s 56.1 Response ¶ 179.) Falls's focus on lubricant also fails to render it an authority Dr. Goodman "could have 'read' [ . . . ] beforehand and 'know[n]' that it proscribed [his] specific conduct," including whether he should have assessed other examination methods. Zorn, 146 S. Ct. at 930 (citing Wesby, 583 U.S. at 63). Moreover, none of the aforementioned precedents involve parolees, who "have severely diminished expectations of privacy by virtue of their status alone." Samson v. California, 547 U.S. 843, 852 (2006); see also Rivera v. Madan, No. 10-CV-4136, 2013 WL 4860116, at *4 (S.D.N.Y. Sept. 12, 2013) ("Courts must 'examin[e] the totality of the circumstances' surrounding the search, which includes the Plaintiff's status as a parolee.") (quoting United States v. Knights, 534 U.S. 112,118 (2001)).

In an attempt to show Dr. Goodman violated a clearly established right, Plaintiff's Reply cites several additional

25

cases beyond Sloley and Sanchez.  These fare no better.  For example, Schmerber v. California is cited for the broad proposition that "intrusions into the human body" must meet Fourth Amendment standards of reasonableness. 384 U.S. 757, 767-68 (1966).  This is far too amorphous a concept to define any right at issue with a "high degree of specificity."  Zorn, 146 S. Ct. at 930 (citing Kisela v. Hughes, 584 U.S. 100, 105 (2021)) ("principles stated generally" do not suffice to clearly establish a right).  In any event, Schmerber is not a qualified immunity case and did not address body cavity searches.

The cases Plaintiff proffers that specifically involve rectal searches are also distinguishable.  Travis v. Village of Dobbs Ferry, for example, involved a plaintiff who was subjected to a strip search unsupported by any reasonable suspicion.  355 F. Supp. 2d 740, 743-46 (S.D.N.Y. 2005).  Moreover, Travis addressed extreme facts: Police spent two months monitoring the plaintiff, who had no criminal record, for drug activity.  Travis, 355 F. Supp. 2d at 744.  Police, who monitored the plaintiff based on an uncorroborated tip, never observed her participate in drug activity and did not find drugs in her car after she consented to a search.  Id. at 745-46.  In her decision, Judge McMahon explained the facts "of this particular case are as outrageous as any I have seen.  The behavior of the defendants was completely unreasonable." Id. at 754.

26

Similarly, Monroe v. Gould involved a plaintiff who, after being arrested for misdemeanor drug and weapon charges, was subjected to a body cavity search in a police station absent any reasonable suspicion he "was concealing contraband inside his body" and defendants did "not point to plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body." 372 F. Supp. 3d 197, 204-05 (S.D.N.Y. 2019) (emphasis in original). Here, by contrast, Dr. Goodman was informed Plaintiff might possess rectally-concealed narcotics based on law enforcement's own search, and independently observed erratic conduct throughout the evening. (See infra pp. 4-5.) Plaintiff's reliance on Harris v. Miller, is likewise misplaced, as it turned on a "violent and forceful" strip search of a female inmate by male officers and focused its reasoning heavily on the cross-gender nature of the search, which is not at issue here.[6] 818 F.3d 49, 60 (2d Cir. 2016).

---

[6] Plaintiff also cites to United States v. Gonzalez, 111 F. Supp. 3d 416, 432 (S.D.N.Y. 2015), a suppression case where a court declined to find probable cause due to a non-credible witness. As this Court may not make credibility judgments at this stage, this precedent is also unavailing. In another case Plaintiff cites to, Santiago v. City of Yonkers, No. 13-CV-1077, 2015 WL 6914799, at *7 (S.D.N.Y. Oct. 30, 2015), a court declined to grant summary judgment on a search-based claim due to a factual dispute about whether an officer "inserted his fingers into plaintiff's rectum —in the context of either a sexual assault or a manual cavity." No such factual dispute is present here.

27

In short: Because the Supreme Court's recent guidance in Zorn requires far more than generalized Fourth Amendment principles, and because Plaintiff identifies no precedent proscribing the illegality of Dr. Goodman's conduct with the required "high degree of specificity," the Court SUSTAINS Dr. Goodman's objection as to qualified immunity.

C. Remaining State Law Claims

Although federal courts have supplemental jurisdiction over state law claims, "a district court 'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)). District courts have wide latitude in deciding whether to exercise supplemental jurisdiction. See Id. at 122. Because there are no remaining claims for which this Court has original jurisdiction, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and accordingly DECLINES TO ADOPT Judge Wicks's R&R to the extent it recommends exercising jurisdiction over the state-law claims.

IV. Unobjected Portions of the R&R

As Judge Wicks noted in the R&R, "failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision." Caidor v. Onondaga

28

Cnty., 517 F.3d 601, 604 (2d Cir. 2008).  The Court accordingly ADOPTS the portions of Judge Wicks's R&R that were not specifically objected to.

## Conclusion

For the stated reasons, IT IS HEREBY ORDERED that Dr. Goodman's Objections are SUSTAINED in part and OVERRULED in part. Accordingly:

I.   The Court ADOPTS the Judge Wicks's Report and Recommendation to the extent it recommended granting summary judgment as to the malicious prosecution, abuse of process, fabrication of evidence, cruel and unusual punishment, substantive due process, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence claims; and

II.  The Court DECLINES TO ADOPT Judge Wicks's Report and Recommendation to the extent it recommends denying summary judgment as to the Fourth Amendment, assault and battery, medical malpractice, and false imprisonment claims.

Having adopted in part and rejected in part Judge Wicks's R&R, the Court rules in the following manner:

I.   Because Dr. Goodman is entitled to qualified immunity, the Court GRANTS his Motion for Summary Judgment as to the remaining federal claims; and

II.  Because there are no remaining federal claims, the Court declines to take jurisdiction over the remaining state law claims.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: June 9, 2026
       Central Islip, New York

29